# ATTACHMENT C



Date of Interview: October 15, 2003

BRIAN M. ANGER ("ANGER") was interviewed on the above date by Investigator J. Martin Shanahan. Also present was Attorney Nicholas Katsonis at his office in 40 Southbridge Street, Worcester, MA 01608. ANGER was advised that the writer is conducting an official investigation for the Employee Benefits Security Administration, U. S. Department of Labor pursuant to the ERISA.

ANGER was further advised that the writer was requesting her voluntary cooperation, and that any information obtained during this official investigation which may involve violation of other laws will be referred to the appropriate agency for consideration.

In response to questioning, ANGER provided the following information:

1. He was born on April 2, 1955 and was formerly the President of NDI International Inc., a/k/a Northeast Display (hereafter referred to as "NDI").

2. NDI was a Massachusetts Corporation founded by ANGER almost twenty (20) years ago. After operating for several years as a sole proprietorship, as a part-time job, NDI was incorporated in 1985 as an S-Corp.

3. NDI manufactured and installed display cases for merchandise in retail stores. Its largest and most important client was Staples Corporation, a discount retailer of office supplies and printing services. Other major clients included Yankee Candle Corporation and Learning Express Corporation.

4. Aside from myself, NDI only had a few key employees. Those included WILLIAM UTLEY, a/k/a BILL UTLEY (hereafter referred to as "UTLEY") who served as the "Vice President of Finance/Accounting Manager". In addition to UTLEY, a critically important salesperson was WILLIAM FORD, a/k/a BILL FORD who was brought in during the last few years to try to resurrect the company and "turn things around" after it lost the Staples account.

5. NDI was a non-union shop.

### NDI Financing

6. He controlled the ownership of NDI by owning 96% of the outstanding

By: J. Martin Shanahan
At: EBSA Boston, MA

This document is the property of the Employee Benefits Security Administration
Its contents are not to be disclosed to unauthorized persons.

Date Prepared: 10/16/03
File No.: 31-027215

PWBA 202
(Rev. 9/87)

common stock. The remaining 4% was split between his two adult sons. He contributed thousands of dollars of his own money to NDI—both before the loss of major clients in 1999 and after.

7. NDI raised the lion's share of its capital by borrowing money from financial institutions. These loans included a Small Business Administration (SBA) Loan and "two or three loans from Flagship Bank." With respect the SBA financing, he does not remember the name of the Small Business Investment Corporation (SBIC) through with he was able to obtain the loan.

8. Flagship Bank's financing was a form of "asset based lending." With this type of arrangement, our financial statements were very carefully scrutinized by Flagship. The most important responsibility of UTLEY was working with the bank to keep them happy.

9. The Loan Officer at Flagship was TIM MUSGRAVES.

### Origins of the 401(k) Plan

10. The Northeast Display, Inc. 401(k) Profit Sharing Plan (hereafter referred to as the "401(k) Plan") was started in the mid-1990's, although he's not sure exactly when. He recalls UTLEY suggestion that the company start a retirement savings plan and that many of his employees were younger workers that were looking for a benefit like this.

11. At the time the 401(k) Plan was initiated, the company was doing very well.

12. He remembers talking to UTLEY about establishing the 401(k) Plan. At the time, UTLEY was doing a lot of benefits analysis relating to the health plan—primarily to determine whether or not NDI was getting a good price for its benefits. UTLEY in turn contacted Manulife, CAF Pension and ED ZYWEIN.

13. The basic format of the 401(k) Plan is that it permits Employee Contributions via payroll deductions. Employees, at their election, were permitted to contribute a percentage of their pre-tax pay (up to the amount allowed by law) to the 401(k) Plan.

### Payroll and 401(k) Contributions

14. The payroll function of NDI was outsourced to Paychex Payroll Services (hereafter referred to as "Paychex"). Before they chose to go with Paychex, they were using ADP Payroll Services. SHIELA MIHOUBI (hereafter referred to as "MIHOUBI") and UTLEY would handle most of the day-to-day payroll

By: J. Martin Shanahan
At: EBSA, Boston, MA

Date Prepared: 10/16/03
File No.: 31-027215

PWBA 202
(Rev. 9/87)

This document is the property of the Employee Benefits Security Administration
Its contents are not to be disclosed to unauthorized persons.

15. Accounting for payroll started at the employee/supervisor level. First, almost all NDI employees are paid on an hourly basis. Each employee's time is accounted and reviewed by their immediate supervisor at the end of the pay-period. This includes the dates, hours, time worked, etc. After the time worked is was approved by the supervisor, it was submitted to MIHOUBI for further processing. After any problems were corrected, this data was transmitted to Paychex, which would in turn, generate payroll checks.

16. Paychex prepares checks and a Payroll Report. The checks and report are overnight express mailed to NDI. Checks are distributed to employees and the 401(k) employee withholdings were mailed to the financial institution (Manulife Financial).

17. UTLEY's employment was terminated in June 2002 after which he no longer dealt with MIHOUBI or the payroll function of NDI.

[Note: See section entitled "NDI Bankruptcy and Missing Employee Contributions" for additional information relating to Payroll Contributions.]

### NDI's Decline Into Bankruptcy

18. Due to the continual loss of clients and an overall worsening of the economy, Flagship indicated their wish to no longer do business with NDI. Flagship represented to them that they would work with NDI to obtain financing, but made certain that they had to find another financial institution in the near future. Flagship began expressing their dissatisfaction in late 2000.

19. "They were sweeping the account everyday."

20. Although NDI had several good years—up through and including 1999—they were now loosing money because of the loss of the Staples account. Each month after they lost Staples, the economy continued to worsen. After September 11, 2001, they reached a low point. During this time several national display case manufactures went out of business.

21. Monarch Industries Corporation (hereafter referred to as "Monarch") was a good client and gave NDI a material amount of subcontracting business. Similar to NDI, Monarch was also a display case manufacture and was based in Providence, Rhode Island.

22. When negotiating and communicating with Monarch, he primarily dealt with

By: J. Martin Shanahan
At: EBSA, Boston, MA

Date Prepared: 10/16/03
File No.: 31-027215

This document is the property of the Employee Benefits Security Administration
Its contents are not to be disclosed to unauthorized persons.

PWBA 202
(Rev. 9/87)

HOWARD ANDERSON, who was the CEO/President of Monarch. He also had dealt with DAVID FRIEDMAN, who was the Chairman of the Board. DAVID FRIEDMAN is age 84.

23. He informed some of the Monarch staff of his inability to obtain financing and that he was interested in selling NDI to them. Although Monarch took seriously the offer to sell NDI, they informed NDI that they were unable to comply because Monarch was a union shop. The Collective Bargaining Agreement the international union signed with Monarch required them not to own any non-union shops. Therefore, they reasoned that they could not actually "own" NDI without violating the Collective Bargaining Agreement they had signed.

24. He next suggested to Monarch that they loan him some money to get the business back on track and pay-off the Flagship loans. He theorized that he could borrow the money and over time pay-off the debt owed to Monarch.

25. Negotiations relating to the extension of credit between Monarch and NDI went on between February 2002 and October 2002. While the negotiation was ongoing, he believes Monarch knew that 401(k) money missing/not being remitted to the Plan. At this point he was dealing with a Monarch affiliated company called PMI and STEVEN CASALE, the Controller of Monarch.

26. Ultimately, Monarch and NDI came to a mutual agreement relating to the extension of credit. First, Monarch would have complete "access to the books." Next, they effectively had "the checkbook" of Monarch. Thirdly, they would have a Monarch employee on-site at NDI to make sure the company was running efficiently (this person's name was JAY JOUBERT—an individual he considered to be a "spy" for Monarch.) Finally, Monarch insisted that NDI file Chapter 11 Bankruptcy/reorganization.

27. He agreed to Monarch's terms and they became the Debtor in Possession Finance for NDI.

### Missing 401(k) Contributions

28. He blames the missing contributions to the Plan on UTLEY and the Monarch.

29. "Bill made all the decisions relating to the 401(k)." I only became aware of the problems associated with the Plan in "May or June." At the time he became aware of the problem, he terminated UTLEY's employment.

30. UTLEY resigned as Trustee to the Plan about one year before he was fired.

By: J. Martin Shanahan
At: EBSA, Boston, MA

Date Prepared: 10/16/03
File No.: 31-027215

This document is the property of the Employee Benefits Security Administration
Its contents are not to be disclosed to unauthorized persons.

PWBA 202
(Rev. 9/87)

31. After terminated UTLEY's employment, he gave his own personal account to take over. He "only lasted a week" and quit.

32. After UTLEY terminated employment, contributions continued to go unpaid until Monarch took over.

33. During this time period he thought it made sense to use his cash in the following order. First, make payroll. If the company did not make payroll—that is the net pay to employees after deductions—the employees would walk off the job. Next, pay suppliers of material. If you don't pay the suppliers, you can't get material to makes sales objectives and you will never recover. Next, pay overhead to get the material out the door to make sales. Finally, if there is any money left, you pay the "other stuff" such as tax withholdings and 401(k) contributions.

34. He did not offer an explanation of why 401(k) employee withholdings were included in the same group as employer expenses.

35. In response to a query about employee 401(k) withholdings being the "employee's money" and not the "employer's money," he pointed out that he discussed this matter completely with all of the employees of NDI. Each expressed their appreciation relating to his stick-to-itiveness relating to making the business go.

36. "I spoke with all the people on the 401(k) situation. All were very supportive."

37. "I put in $100,000 into the business."

38. "We [including his wife JEAN ANGER] took out $50,000 in loans on our 401(k) balance and put it into the business."

39. "Manulife would not recognize him as Trustee of the Plan after the Chapter 11 was filed." He did not have an explanation as to how Manulife was aware there was a Chapter 11 filing.

By: J. Martin Shanahan
At: EBSA, Boston, MA

Date Prepared: 10/16/03
File No.: 31-027215

This document is the property of the Employee Benefits Security Administration
Its contents are not to be disclosed to unauthorized persons.

PWBA 202
(Rev. 9/87)